**SHEELY** et al. v. **MARTIN** et al.

No. A–2827.

District Court of Alaska. Third Division. Anchorage.
Dec. 30, 1942.

W. N. Cuddy and George Grigsby, both of Anchorage, for plaintiffs.

Thos. M. Donohoe and John E. Manders, both of Anchorage, for defendants.

HELLENTHAL, District Judge.

This matter came on for hearing upon the amended complaint filed herein, in which complaint it is alleged that the plaintiffs as co-partners were engaged in the dairy business; and that in connection with said business all the plaintiffs, except the plaintiff Ross L. Sheely, entered into a conditional sales agreement, a copy of which is attached to the complaint and marked Exhibit "A", a lease, a copy of which is attached to the complaint and marked Exhibit "B", and a grazing permit, which is also attached to the complaint and marked Exhibit "C"; that each of said instruments was and is an integral part of the transaction. That said sales agreement was for the purchase of the dairy, including the distributing system and all the equipment and cattle connected therewith, a list of which is attached to Exhibit "A" attached to the complaint for a total purchase price of $28,294, $9,800 of which was paid upon the execution of the agreement and $308.22 on the 10th of each and every month thereafter until the purchase price had been fully paid with interest at the rate of 6% per annum from July 1, 1941. That the chief item purchased under said sales agreement was 56 cows and that the defendants warranted that they were the lawful owners of said cows and had full right, power and authority to sell the same. That the plaintiffs aforesaid, relying upon said warranty and representations, entered into said sales agreement, the lease and the grazing permit, and made the original payment under said sales agreement, paid $200 on account of said lease and $110 on account of said grazing permit and entered into possession of said property on July 1, 1941. That the performance of said conditional sales agreement, lease and grazing permit was guaranteed in writing by the plaintiff Ross L. Sheely, a copy of which writing is attached to the complaint and marked Exhibit "D". That the plaintiffs have performed all the conditions of said agreement, lease and grazing permit to the date of the commencement of this action, and in addition to the initial payment above set forth have paid the sum of $1,-

541.10 and $450 interest on the sales agreement, the sum of $1,000 on the lease, and have paid certain sums in connection with a truck, $2,000 for hay and grain and have purchased equipment and made improvements on the premises at the cost of $2,513. That at the time of the execution of the above instruments, a large number of the cows sold to the plaintiffs were diseased and infected with Bang's Disease or contagious abortion, which fact was well known to the defendants and unknown to the plaintiffs, and that the defendants sold and delivered said cows to the plaintiffs with an intent to injure the plaintiffs. That the plaintiffs purchased the cattle for a dairy herd and that said herd was of little value for dairy purposes in the condition in which it was sold. That the plaintiffs have suffered damages in the sum of $15,000. And plaintiffs pray, first, that the conditional sales agreement, Exhibit "A" attached to the complaint, be declared illegal and void; second, that the lease Exhibit "B", attached to the complaint, the grazing permit Exhibit "C", attached to the complaint, and the guaranty, Exhibit "D" attached to the complaint, also be declared void as a part of the same transaction; and that the plaintiffs have judgment against the defendants in the sum of $15,000, and for other equitable relief, costs and an injunction.

The defendants in this case have answered the original complaint, and it was stipulated in open court that said answer might be considered as an answer to the amended complaint and that defendants might if they should desire plead an estoppel. The defendants by their answer deny that there was any segregation of value for the cows or any other item embodied in said conditional sales agreement. Defendants deny that plaintiffs in making said agreement relied upon the representations of the defendants. Deny that the guaranty agreement of Ross L. Sheely was made at the insistence of the defendants and allege that the transfer of the business from the defendants to the plaintiffs was proposed by the said Ross L. Sheely because he did not wish to appear directly as a purchaser.

Defendants deny that the plaintiffs have performed the conditions prescribed in the conditional sales agreement, lease and grazing permit to the date herein. Defendants deny that the plaintiffs have purchased additional equipment and made improvements to the sum of $2,513 or any other sum. And the defendants allege that the plaintiffs did not make the payments specifically to be made by condition of the said conditional sales agreement subsequent to the month of December, 1941 and were and are in default by reason of said non-payments. The defendants deny that at the time of the execution of the sales agreement and for a long time prior thereto a large number of the cows sold to the plaintiffs were infected with Bang's Disease or contagious abortion and that this fact was well known to the defendants and unknown to the plaintiffs and deny that they were sold to the plaintiffs with an intent to injure the plaintiffs. The defendants admit that the plaintiffs have killed and disposed of the cows mentioned in the complaint, but deny that the same were killed or disposed of by necessity and because of said disease. Defendants deny that said herd was infected and deny that said herd was of little value for dairy purposes. Defendants deny that the plaintiffs have suffered damage by any acts or omissions of the defendants, deny that the plaintiffs will suffer irreparable damages if required to perform the agreements, deny that the plaintiffs have no remedy at law and deny that the plaintiffs have suffered damage in the sum of $10,000 or any other sum.

And by way of first counterclaim and first cross-complaint, the defendants allege that the parties entered into the conditional sales agreement, marked Exhibit "A" attached to the complaint, that the plaintiffs complied with the said agreement during the year 1941, that said agreement was guaranteed by the plaintiff Ross L. Sheely, in writing, Exhibit "D" attached to the complaint, that the plaintiffs have defaulted on said agreement, that the defendants declare the balance due on said agreement and

that is $16,952.90, together with interest at the rate of 6% per annum from December 10, 1941.

And for second counterclaim and second cross-complaint the defendants allege the execution of the lease agreement, Exhibit "B" attached to the complaint, that the plaintiff Ross L. Sheely guaranteed the payments therein in writing, Exhibit "D" attached to the complaint, and that no payments have been made since January, 1942, that the plaintiffs have defaulted and that there is $2,000 together with interest at the rate of 6% per annum on each monthly payment of $200 due and owing thereon and that the defendants are entitled to the immediate possession of the leased premises.

And for a third counterclaim and third cross-complaint, it is alleged that the parties entered into the grazing permit, Exhibit "C" attached to the complaint; that the sum of $110 was due the defendants on said permit on the 19th day of August, 1942, and that plaintiffs have failed to make said payment and that the defendants are entitled to the immediate possession of the premises described therein. Whereupon, the defendants pray that the plaintiffs' complaint be dismissed, that they have judgment on their first counterclaim in the sum of $16,952.90 together with interest; that they have judgment on their second counter claim in the sum of $2,000, together with interest; and that the defendants have judgment for immediate possession of the premises and property mentioned in defendants' third counter claim and for costs.

By reply, the plaintiffs state that during all the times in the pleadings referred to plaintiffs were co-partners; that the contracts set forth, Exhibits "A", "B", and "C" attached to the complaint were entered into by the parties thereto for and in behalf of all the plaintiffs. And, replying to the affirmative defenses in addition to certain allegations previously made, state that the chief item contained in the property purchased under Exhibit "A" attached to the complaint, was 56 head of cows which were figured at

$300 per head; the plaintiffs repeat the allegations as to the sums of money paid, allege that the cattle were diseased and infected, and make the same allegations as to the defendants' second and third counter claims.

This cause came on for hearing before a jury on Monday, the 21st day of December, 1942, at which time evidence was offered by the plaintiffs to the effect that the herd of cattle owned by the defendants was examined in April, 1941 by Earl F. Graves, a veterinarian employed by the Territory of Alaska for the purpose of testing cattle for Bang's Disease and other diseases; that on the 22nd day of April such examination was made at which time there were 21 cattle of said herd definitely infected with Bang's Disease and 8 were suspects; that after making said tests the said veterinarian notified the defendant A. T. Martin of the result of said tests, made re-tests in the presence of said Martin and thereafter fully informed the said A. T. Martin of the condition of his herd; at which time the said Graves gave said Martin a copy of his report, marked Plaintiffs' Exhibit "A" in this cause. That in June, 1941, negotiations were entered into between the plaintiffs and the defendants which resulted in the agreements being entered into, Plaintiffs' Exhibits "A", "B", "C" and "D" attached to the complaint herein. That the payments alleged to have been made in the complaint were thereupon made and the plaintiffs went into possession of said herd. That prior to the execution of said agreement the defendant A. T. Martin claims that while the plaintiff Ross L. Sheely was at the premises transferred he informed him that there was some Bang's Disease in the herd, this is denied by the plaintiff Sheely. That in connection with the execution of the conditional sales agreement, Plaintiffs' Exhibit "A" attached to the complaint and while discussing the clause under which defendants claim they sold this herd without warranties whatsoever, the plaintiff Sheely testified that the following conversation was had:

"Mr. Donohoe: Do you recall in my office, you being present, your family being present, Mr. Martin being pres-

ent, Mr. Cuddy being present and myself, discussing the clause in the contract of no warranties and there was a discussion regarding to your having inspected the cows, knowing their condition and that there was no guarantee on it?

"Mr. Sheely: Yes.

"Mr. Donohoe: There was such a discussion at the time?

"Mr. Sheely: May I say what the discussion was?

"Mr. Donohoe: Yes.

"Mr. Sheely: We were in your office, Mr. Donohoe, I was there and Mrs. Sheely, Jack was there, Joe was there, Mr. and Mrs. Martin were there, yourself and Mr. Cuddy. Mr. Cuddy said what about Bang's Disease. Mr. Martin said I don't know anything about it, but he did know about it. He knew it was against the law to sell diseased cows. All he said was there was no warranty in the contract.

"Mr. Donohoe: Didn't Mr. Martin tell you it was impossible to determine whether or not there was Bang's Disease in these cows?

"Mr. Sheely: He said there was no warranty as to the health of the cows. He did not tell me whether it was possible to determine whether they had Bang's Disease."

Nowhere in the evidence is it claimed that the defendant made full disclosures of the condition of the herd. That sometime after the herd was delivered to the plaintiffs one of the cows of the said herd aborted, but that the plaintiffs paid little attention to the same for the reason that it is not infrequent that abortions occur. That thereafter and sometime in September, while the plaintiffs had taken some of the purchased cows to their ranch at Palmer, they were informed by the Health Department that a restriction had been put on said herd on account of Bang's Disease and that plaintiffs were not allowed to move said cattle. That during the fall of 1941 several more of the cows aborted; that the plaintiffs made improvements on the premises as shown by Plaintiffs' Exhibit "D"; that the plaintiffs slaughtered several of the cattle; that thereafter in Janu-

ary, 1942, the witness Graves made another examination of the herd at which time he found that 32 of the remaining herd were infected with Bang's Disease, 8 were clean and the balance were suspects. That thereupon the plaintiffs brought this action.

The evidence shows that of the original herd purchased 36 were slaughtered and sold for beef for which the plaintiffs derived $4,472.20, six died and that there are 14 cows and one bull left of the original herd. That the plaintiffs brought 13 cows and one bull from Palmer which are now on the premises, that 8 or 9 of these cattle were brought from Palmer before the plaintiffs had full knowledge as to the diseased condition of this herd, but plaintiffs had some knowledge thereof and that the balance were brought to the premises from Palmer after the plaintiffs were fully informed of the diseased condition of the herd. That the plaintiffs paid the defendants under Exhibit "A" attached to the complaint the sums of $9,800, $1,541.10 and $450 interest; that the plaintiffs paid the defendants under Exhibit "B" attached to the complaint the sum of $1200, and the sum of $110 under Exhibit "C" attached to the complaint; that the plaintiffs paid to the defendants either directly or indirectly for feed the sum of $2,000, and have paid for improvements the various items stated in Plaintiffs' Exhibit "D" only part of which has been delivered. The evidence also shows that the plaintiffs have paid defendants an indefinite amount in connection with the purchase of trucks, but since these trucks were afterwards disposed of by the plaintiffs this amount becomes immaterial. The plaintiff Ross L. Sheely testified that the reasonable rental value of the premises under the circumstances was $50 per month.

The plaintiffs stipulated that their complaint, and the defendants that their counter claims, were in equity. Whereupon, the Court dismissed the jury.

Chapter 55, Alaska Session Laws 1919, provides as follows:

"Section 1. To import or to bring, into the Territory of Alaska, animals of whatsoever kind or character, diseased or infected with the diseases mentioned in Section 3 of this Act, is hereby declared to be injurious to the public health, against public policy, illegal, and punishable as herein provided.

"Section 2. To own, have in one's possession, sell, transfer, transport, drive or convey, from one section of the Territory to another, animals or livestock of whatsoever kind or character, diseased or infected with the diseases mentioned in Section 3 of this Act, is hereby declared to be injurious to the public health, against public policy, illegal, and punishable as herein provided.

"Section 3. It shall be unlawful to bring, into the Territory of Alaska, any horses, cattle, or swine, for work, feeding, breeding or dairy purposes, without first having such animals examined and found free from the following contagious diseases: glanders, farcy, tuberculosis, actinomycosis, rinderpest, foot and mouth disease, contagious abortion, contagious keratitis, scabies, maladie du coit, swine plague and hog cholera,  *  *  *.

"Section 4. For each evasion or violation of any provision of the three sections last preceding, the shipper or party responsible for the evasion or violation, shall be fined not more than Five Hundred Dollars ($500.00);  *  *  *."

■■■  6 R.C.L. Contracts, p. 701, Sec. 107:

"Express or Implied Prohibition.—A contract directly and explicitly prohibited by a constitutional statute in unmistakable language is absolutely void. That has never been judicially doubted, and is unanimously conceded. To hold such a contract binding would be to enforce that which the legislature has forbidden, to give effect to that which the legislature has declared void,—the repeal of a law by judicial construction. However, it is not necessary that there should be an express prohibition in a statute to render void a contract made in violation of it.

"108. Implication from Imposition of Penalty.—In order that there may be an implied prohibition the imposition of a penalty is not essential. In other words, it is not necessary that a statute should impose a penalty for doing or omitting to do something in order to make void a contract which is opposed to its operation. The obverse of this proposition is, however, the basis of a well established rule, which dates at least from the time of Lord Holt. The rule, as stated in the early decisions, is that every contract made by or about a matter or thing which is prohibited and made unlawful by any statute, is a void contract, though the statute itself doth not mention that it shall be so, but only inflicts a penalty on the offender, because a penalty implies a prohibition though there are no prohibitory words in the statute. Although it might perhaps not warrant the conclusion that a penalty implies a prohibition for the purpose of making the offense punishable by indictment in case the law had prescribed another and a specific punishment for the offense, Lord Holt's remark is an authority for the proposition that a contract made in direct violation of a statute providing a penalty for the violation thereof is illegal though the contract is not in express terms prohibited or pronounced void."

■■■■ Restatement of the Law, Contracts, § 598, p. 1109:

"Topic 12. Effect of Illegality. Sec. 598. Generally No Remedy on an Illegal Bargain. A party to an illegal bargain can neither recover damages for breach thereof nor, by rescinding the bargain, recover the performance that he has rendered thereunder or its value, except as stated in Secs. 599-609.

"Comment:

"a. The statement that all illegal bargains are void is not wholly accurate. It is true that many such bargains are entirely without effect on the legal relations of the parties and that a court will only under very exceptional circumstances enforce specifically an illegal agreement, but

the rule of public policy that forbids an action for damages for breach of such an agreement is not based on the impropriety of compelling the defendant to pay the damages. That in itself would generally be a desirable thing. When relief is denied it is because the plaintiff is a wrongdoer, and to such a person the law denies relief. Courts do not wish to aid a man who founds his cause of action upon his own immoral or illegal act. If from the plaintiff's own statement or otherwise it appears that the bargain forming the basis of the action is opposed to public policy or transgresses statutory prohibitions, the courts ordinarily give him no assistance. The court's refusal is not for the sake of the defendant, but because it will not aid such a plaintiff. So if the plaintiff and defendant changed sides, and the defendant, equally in fault, was to bring his action against the plaintiff, the latter would then have the advantage; for where both are equally in fault the position of the defendant is the stronger.

"b. To deny such persons recovery, though an equally guilty defendant thereby escapes punishment, tends to diminish the number of illegal agreements. But not all illegal agreements are for that reason void. A rule to that effect would have unfortunate consequences, since in many cases it would protect a guilty defendant from paying damages to an innocent plaintiff, or would otherwise produce undesirable results. Cases of this sort are covered by the rules stated in Secs. 599-608. Doubtless a statute can and sometimes does make a bargain absolutely void, but even though a statute so states in terms, 'void' sometimes means voidable, and unless no other conclusion is possible from the words of a statute or from the policy on which a statute is based, it should not be held to make all agreements contravening it wholly void.

"c. The rule stated in the Section precludes recovery on principles of quasi-contract for benefits conferred under an illegal bargain, as well as an action on the bargain itself.

"Sec. 599. Ignorance of Facts Rendering Bargain Illegal. Where the illegality of a bargain is due to (a) facts

of which one party is justifiably ignorant ·and the other party is not, or (b) statutory or executive regulations of a minor character relating to a particular business which are unknown to one party, who is justified in assuming special knowledge by the other party of the requirements of the law, the illegality does not preclude recovery by the ignorant party of compensation for any performance rendered while he is still justifiably ignorant, or for losses incurred or gains prevented by non-performance of the bargain."

Restatement of the Law, Restitution, § 149 p. 595:

"Sec. 149 * * * Actions for restitution have for their primary purpose taking from the defendant and restoring to the plaintiff something to which the plaintiff is entitled, or if this is not done, causing the defendant to pay the plaintiff an amount which will restore the plaintiff to the position in which he was before the defendant received the benefit. If the value of what was received and what was lost were always equal, there would be no substantial problem as to the amount of recovery, since actions of restitution are not punitive. In fact, however, the plaintiff frequently has lost more than the defendant has gained, and sometimes the defendant has gained more than the plaintiff has lost.

"In such cases the measure of restitution is determined with reference to the tortiousness of the defendant's conduct or the negligence or other fault of one or both of the parties in creating the situation giving rise to the right to restitution. If the defendant was tortious in his acquisition of the benefit he is required to pay for what the other has lost although that is more than the recipient benefited. If he was consciously tortious in acquiring the benefit, he is also deprived of any profit derived from his subsequent dealing with it. If he was no more at fault than the claimant, he is not required to pay for losses in excess of benefit received by him and he is permitted to retain gains which result from his dealing with the property. There

are situations not falling within the above categories as to which, while they are subject to the general equitable principle that restitution is granted to the extent and only to the extent that justice between the parties requires, it is not feasible to make specific statements (see the Caveat to Sec. 155)."

■ Under the law and the evidence above cited, there can be no question but that the contracts involved in this case are illegal and should be declared so. This disposes of the defendants' counterclaims because there can be no breach of these illegal contracts for which the defendants can recover. Under the evidence the Court must find that the defendants had full knowledge of the facts making this contract illegal, and further that the defendants did not make full disclosure of said facts before entering into this contract. There was some talk of Bang's Disease when the parties were about to enter into these contracts, at which time the clause of the contract relieving the defendants from warranties was discussed. And the defendant A. T. Martin claims that he discussed the matter with the plaintiff Ross L. Sheely, which the plaintiff Ross L. Sheely denies, but at no time does said defendant or either of them claim to have made full disclosures. This, taken in connection with the allegations of the answer herein, wherein the defendants specifically deny that they had knowledge of the fact that the herd was infected with Bang's Disease previous to entering into the contract, leaves the Court to find that the defendants purposely and deliberately kept these facts from the plaintiff, and that, therefore, the plaintiffs were ignorant of the facts which made the contracts illegal, and for that reason are entitled to recover the monies paid under the contracts since the Court finds that these contracts although executed separately are all part of the illegal transaction. Therefore, the Court finds that the plaintiffs should recover from the defendants the sum of $9,800, $1,541.10 and $450 interest, monies paid under the contract Exhibit "A" attached to the complaint, $1,200,

monies paid under Exhibit "B" attached to the complaint, $110 paid under Exhibit "C" attached to the complaint, $1,766.85 paid under Exhibit "D" attached to the complaint, which is the full amount delivered under said exhibit, but does not include supplies on order, which are the plaintiffs' and which the plaintiffs are allowed to divert and dispose of in whatever manner they see fit, except that the Court excludes from the items set up in that exhibit, $32.50 paid for supplies, milk cases, etc., $110.90 paid for quart bottles, and $80 paid for one-half pint bottles, for the reason that it is not shown by the evidence that these supplies purchased in connection with the running of said business are in excess of the inventory attached to the complaint. The Court also deducts 50% of the three items mentioned in said exhibit, milk pump motor—$17.50, separator motor—$40 and a Crepaco electric motor for milk pump—$17.50, and the amount paid for painting the milk room—$6, making a total of $14,867.95 with interest on the various amounts from the time they were incurred, less $4,472.20, which the plaintiffs received for the slaughtered cattle, and since the dates this sum was received does not appear in the record no interest can be allowed on same.

▆▆▆ The Court disallows the plaintiffs the claim for $2,000 for hay purchased at the time the original contracts "A.", "B" and "C" attached to the complaint were entered into or shortly thereafter, because the Court finds that said transaction was collaterally connected with the illegal bargain only.

Restatement of the Law, Contracts, § 597, p. 1108:

"Sec. 597. Bargain Connected Collaterally with Illegality. A bargain collaterally and remotely connected with an illegal purpose or act is not rendered illegal thereby if proof of the bargain can be made without relying upon the illegal transaction."

The Court finds that the cattle delivered by the defendants to the plaintiffs are accounted for by the cattle still remaining on hand, those slaughtered and those that have

died, and that therefore the cattle delivered have been fully accounted for. The Court finds that the plaintiffs brought certain cattle to the premises of which the plaintiffs took possession at the time the illegal contracts were executed, that these cattle are still the cattle of the plaintiffs to be disposed of as the plaintiffs see fit, either by slaughtering or removing them if that is possible. The Court feels that under the evidence in this case, part of said cattle were brought to the premises after the plaintiffs had full knowledge of the facts and clearly the plaintiffs would not be entitled to recover from the defendants for such cattle; that part of the remaining cattle were brought there when the plaintiffs had considerable knowledge of the facts and would be required to investigate further before bringing cattle there for which they could hold the defendants liable. The first of these cattle were, however, brought there when the plaintiffs had no knowledge or very little knowledge of said disease. If the Court made the defendants pay $300 apiece for these cattle as it is contended for by the plaintiffs, the Court would in fact be making and enforcing an illegal transaction. Under the circumstances, the Court is going to offset whatever the plaintiffs were entitled to under said claim against whatever claim the defendants may be entitled to for rent of the premises, which right seems very doubtful to the Court because the rent is part of and closely connected with the illegal contracts.

It will be noted that the plaintiffs under the above opinion will recover less than they would be able to retain if the Court had found that the parties were in pari delictc as well as particeps criminis and left them where they placed themselves, without giving aid to either party. If this had been done the plaintiffs would have been entitled to retain $12,000 worth of personal property, the $4,472.20 obtained for the cattle that were slaughtered and the cattle on the ranch. The plaintiffs, however, will have the satisfaction of knowing that what they have obtained in this case was by virtue of the principles of equity and good

conscience and not merely by being in an advantageous position under an illegal contract in which they were in pari delicto.

The plaintiffs may prepare findings of fact, conclusions of law, and a decree in accordance with this opinion.